**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ROBERT ALBERTSEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 13 C 3509** |
| | ) | |
| **CAROLYN COLVIN, Commissioner** | ) | **Judge Rebecca R. Pallmeyer** |
| **of Social Security Administration,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Robert Albertsen brings this action against the Commissioner of Social Security, Carolyn Colvin, pursuant to the Social Security Act, 42 U.S.C. § 405(g) (the "Act"), seeking review of the Social Security Administration's decision to deny Plaintiff's application for disability insurance benefits and Supplemental Social Security income. After a hearing, an Administrative Law Judge ("ALJ") determined that Plaintiff was disabled from May 1, 2008 to July 31, 2009, due to degenerative disc disease of the spine and hypertension. The ALJ determined that Plaintiff was not disabled before or after that 15-month period because, the ALJ concluded, before May 2008 and after July 2009, Plaintiff had the Residual Functional Capacity ("RFC") to perform certain sedentary, unskilled, routine work.

The Social Security Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner of the Social Security. Plaintiff has moved for summary judgment reversing the decision of the ALJ, or in the alternative, remanding his claim for further proceedings. Plaintiff contends that the ALJ erred in finding (a) that Plaintiff was no longer disabled as of August 1, 2009, (b) that Plaintiff's mental impairments were not severe, and (c) that the side effects of Plaintiff's medication were minimal. Plaintiff further asserts that the ALJ did not provide sufficient reasons for rejecting the opinion of Plaintiff's treating physician, and that in testifying concerning jobs that Plaintiff can perform, the vocational expert used job criteria

inconsistent with the ALJ's RFC finding. As explained here, the court remands this case for a further evaluation of Plaintiff's subjective symptoms and mental impairment, and for a re-evaluation of Plaintiff's treating physician's opinions on the question of whether Plaintiff was disabled prior to May 2008.

## **BACKGROUND**

### A.   **Factual Background**

Plaintiff Robert Albertsen, born on June 28, 1961, was forty-four years old in April 2006, when he claims to have become disabled by earlier injuries to his back and neck. (Certified Copy of the Admin. Record [7], hereinafter "R.," at 38.) Plaintiff has a high school education, and has worked as a painter and security guard. (R. at 38.) On November 2, 2006, he filed an application for disability insurance benefits, alleging disability since April 23, 2006. (R. at 121, 234.) The state agency denied Plaintiff's application in February 2007, and again, after reconsideration, in April 2007. (R. at 121-22.) Thereafter, Plaintiff, represented by counsel, requested a hearing before an ALJ. (*Id.*) Following the February 5, 2008 hearing, the ALJ concluded, in a written decision, that although Plaintiff suffered from degenerative disc disease of the spine, his mental impairments were not severe, and Plaintiff was not disabled because he retained the RFC to perform sedentary work. (R. at 123-29.)

The Social Security Appeals Council remanded that decision for a more thorough evaluation of the opinions of Plaintiff's treating physician, Dr. John Mikuzis, and the testimony of Plaintiff's wife, and for further consideration of Plaintiff's mental impairment. (R. at 26.) On October 22, 2009, a second hearing took place, before a different ALJ, who heard testimony from Plaintiff and his wife, medical expert Carl Leigh, M.D., and vocational expert Grace Gianforte. (*Id.*) Plaintiff also presented the ALJ with evidence in the form of medical records, described in some detail below.

On May 18, 2010, the ALJ issued a written decision, in which she concluded that Plaintiff was disabled for a closed period of time from May 1, 2008 to July 31, 2009. (R. at 22-40.) The

ALJ concluded that Plaintiff's condition had improved, and his disability ended on August 1, 2009.  (*Id.*)  On August 10, 2011, the Social Security Appeals Council denied Plaintiff's request for review of the ALJ's decision (R. at 10), and on May 10, 2013, Plaintiff filed this action [1] to challenge that decision.[1]

## 1.    Medical Evidence

The medical evidence presented at the hearing shows that Plaintiff suffers from both physical and mental impairments.  In a January 16, 2006 medical report, Plaintiff's main treating physician, Dr. John Mikuzis, noted that he had been treating Plaintiff since November 2002 for left shoulder and left arm pain caused by a work-related injury.  (R. at 375.)  Although Dr. Mikuzis reported that physical therapy had improved Plaintiff's range of motion, he noted that Plaintiff continued to experience "pain and ongoing muscle tightness, spasm, and burning" in his left shoulder area.  (R. at 376-77.)  Due to his physical impairments, the report concluded, Plaintiff could not return to his previous work as a painter.  (R. at 377.)  Plaintiff visited Dr. Mikuzis several more times in 2006 and 2007.  Dr. Mikuzis's treatment records from this period identify Plaintiff's symptoms as including muscle weakness, muscle pain, and fatigue; Plaintiff retained normal gait and full range of motion in his joints.  (R. at 381-84, 587-96.)  Dr. Mikuzis prescribed Norco[2] in November 2002, which initially eased Plaintiff's pain, but by 2007 Plaintiff required an increased dose of 3 to 4 times what he was using in 2003.  (R. at 375; 600.)  By October 2007, and again in December 2007, according to Dr. Mikuzis's treatment notes, Plaintiff reported feeling increased pain, including burning and stabbing pains in his back and neck as well as numbness in his legs.  (R. at 587-89.)  Plaintiff also consistently reported sleep disturbance during this time.  (*Id.*)

---

[1]    In a letter dated April 29, 2013, the Social Security Appeals Council provided Plaintiff with a 30-day extension of time to file his civil action in federal court.  (R. at 1.)

[2]    Norco contains a combination of acetaminophen and hydrocodone, an opioid pain medication, and is used to relieve pain.  J.E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE, VOL. 4, N-144 (2015) ("hereinafter "DICTIONARY OF MEDICINE").

On December 29, 2007, Dr. Mikuzis provided a medical narrative report to Plaintiff's lawyer, in which he concluded that Plaintiff suffered from worsening pain and spasms in his back, neck, and arm, rendering him unable to work even on a part-time basis.  (R. at 599-600.)  According to the report, Plaintiff's neck rotation was restricted by 50%, and his shoulder and upper arm strength was "4/5."  (R. at 600.)  Dr. Mikuzis further noted that Plaintiff's use of Norco had increased since 2003, he used alcohol to relieve his pain, and he was experiencing symptoms of depression, withdrawal, and anxiety.  (*Id.*)  Dr. Mikuzis opined that, because of Plaintiff's deteriorating condition, Plaintiff was unable to engage in any gainful employment.  (*Id.*)

In December 2006 and January 2007, Plaintiff was examined by two state agency professionals.  The first of these, Dr. Afiz Taiwo, an internist specializing in occupational medicine, noted that Plaintiff complained of sharp, constant pain in his left upper back and left shoulder, and that Plaintiff took 8-10 Norco tablets per day.  Dr. Taiwo's ultimate diagnosis was "back pain" and "elevated blood pressure."  (R. at 463-64.)  Dr. Taiwo concluded, however, that Plaintiff had normal range of motion and normal gait, had no difficulty walking, feeding, bathing, dressing, driving, or shopping, and that he could lift, push, or pull up to 20 pounds.  Dr. William Hilger, a psychologist, examined Plaintiff in January 2007 and diagnosed him with an "adjustment disorder of adulthood" as well as mild depression stemming from his physical difficulties and loss of employment.  (R. at 470.)  Dr. Hilger noted that Plaintiff demonstrated average intellectual functioning and was mentally capable of performing lighter, clerical duties that would not require him to look steadily at a computer monitor.  (R. at 470-71.)

MRI scans performed on Plaintiff in October 2008 and December 2008 revealed mild degenerative disc disease and a herniated disc, which resulted in nerve root compression.  (R. at 618-19.)  Then during a January 7, 2009 examination by Plaintiff's new treating physician, Dr. Alyce Jackson, Plaintiff reported increased neck and back pain as well as muscle spasms.  (R. at 612-13.)  To treat his continued neck and back pain, Dr. Jackson prescribed Plaintiff several

medications, including morphine, Norco, Motrin, and Flexeril,[3] and, at Dr. Jackson's instruction, an anesthesiologist provided Plaintiff with two thoracic steroid injections. (R. at 605-07, 632, 635.)

On February 26, 2009, Dr. Charles Harvey, a neurosurgeon, examined Plaintiff. Dr. Harvey noted that Plaintiff complained of numbness and tingling, and that Plaintiff reported that he ranked his pain as never less than five on a one-to-ten scale, and, at worst, nine. (R. at 620-23.) Dr. Harvey observed that Plaintiff's pain was relieved by applying heat or taking pain medication, and that Plaintiff retained full muscle strength and a normal gait, and did not report joint pain. (R. at 22.) By April 2009, Dr. Harvey determined that surgery was necessary; on April 27, 2009, Plaintiff underwent an anterior cervical discectomy to treat his herniated disc and to relieve his spinal pain. (R. at 625-29.)

Post-surgery, there are three medical examinations in the record. At Plaintiff's first postsurgical examination, on May 19, 2009, Dr. Harvey noted that the discectomy had eased Plaintiff's pain. (R. at 630.) Plaintiff was taking morphine, Norco, and Flexeril for pain relief on an as needed basis. (*Id.*) Then, on June 22, 2009, Plaintiff reported to Dr. Jackson that he was experiencing muscle spasms in his neck and numbness and bilateral pain in his neck and shoulders. (R. at 614-615.) On July 23, 2009, Dr. Harvey noted that Plaintiff "reports that he is not having any pain symptoms following the surgery, but he is having non-radiating focal pain to his mid-back between his shoulder blades. He rates his back pain symptoms 7/10 today." (R. at 664.) Dr. Harvey also stated that Plaintiff continued to take his medications—aspirin, Norco, Flexeril, nitroglycerin sublingual tablets,[4] metoprolol,[5] and Prozac[6]. (*Id.*) On August 20, 2009,

---

[3]    Flexeril (a brand name for cyclobenzaprine) is a muscle relaxant used to treat skeletal muscle conditions, such as muscle spasms and pain. DICTIONARY OF MEDICINE, VOL. 2, F-112.

[4]    Nitroglycerin is used to treat episodes of chest pain associated with coronary artery disease (narrowing of the blood vessels that supply blood to the heart). DICTIONARY OF MEDICINE, VOL. 4, N-117.

Plaintiff again saw Dr. Jackson. He reported suffering from posterior neck pain, and had "been experiencing increased stiffness in his neck," as well as muscle spasms. (R. at 666-667.)

Plaintiff's medical records also reveal treatment for anxiety and depression throughout 2008 and 2009. May 2008 and June 2008 psychological treatment records from the Will County Community Health Center note that Plaintiff was suffering from anxiety and depression, for which he was given Lexapro.[7] (R. at 601-604.) These treatment records do not contain any other clinical observations regarding Plaintiff's condition. (*Id.*)

On January 28, 2009, Plaintiff sought treatment for depression at Aunt Martha's Healthcare Network, and saw a psychiatrist there, Dr. Alexander Harlan, two days later. (R. at 642.) On January 30, 2009, Dr. Harlan first diagnosed Plaintiff with major depressive disorder and prescribed Plaintiff 5 milligrams of Prozac per day. (R. at 648.) According to Dr. Harlan's treatment note, Plaintiff reported experiencing suicidal thoughts, worsening memory, fatigue, and poor concentration and decision-making, but Plaintiff's motor activity was within normal limits, his thought process was goal-directed, and his insight and judgment were fair. (R. at 648-652).

During a follow-up psychiatric evaluation with Dr. Harlan on February 27, 2009, Plaintiff reported that he was suffering from fewer suicidal thoughts, but that he still had no interest in activities or a social life, and that he was still constantly tired. (R. at 646.) Dr. Harlan noted that Plaintiff's motor activity was slow and his thought process was "circumstantial." (*Id.*) Dr. Harlan also marked on the treatment form that Plaintiff's affect was "constricted" and added a one-word note: "subdued!" (*Id.*) Dr. Harlan increased Plaintiff's dosage of Prozac to 15 milligrams per morning. (*Id.*) Plaintiff's general diagnoses were the same in June 2009, although Dr. Harlan

---

[5]    Metroprolol is used to treat a number of conditions, including hypertension, chest pain, congestive heart failure, as well as to prevent headaches in those with migraines. *Id.* at M-187-88.

[6]    Prozac (a brand name for fluoxetine) is a selective serotonin reuptake inhibitor used to treat depression. DICTIONARY OF MEDICINE, VOL. 5, P-493.

[7]    Lexapro (a brand name for escitalopram) is a selective serotonin reuptake inhibitor used to treat anxiety and depression. DICTIONARY OF MEDICINE, VOL. 3, L-103.

documented that Plaintiff reported feeling less suicidal. (R. at 644.) Dr. Harlan continued to prescribe 15 milligrams of Prozac each morning. (*Id.*)

### 2. Plaintiff's Testimony

Plaintiff testified that he was a security guard in 2006 when he left his job due to neck pain that rendered it difficult for him to sit and monitor a computer screen for an eight-hour work shift. (R. at 50.) From 2002 to 2008 Plaintiff testified that he saw a pain management doctor, Dr. Mikuzis. (R. at 54.) Dr. Mikuzis prescribed ultrasounds and massages, and "a lot of injections," but Plaintiff did not receive significant relief from these treatments. Plaintiff stopped seeing Dr. Mikuzis in 2008 because Plaintiff did not have insurance to cover the cost. (*Id.*) Plaintiff then began seeing Dr. Harvey in 2009, who recommended Plaintiff undergo a fusion and discectomy in April 2009. (*Id.*) Consistent with medical records, Plaintiff testified at the hearing that the discectomy alleviated his neck and back pain initially, but his pain returned to pre-surgical levels just a few weeks later. (R. at 55.)

On the day of the hearing, Plaintiff testified that he still suffered from the same neck pain he experienced in 2006, and rated his pain at seven out of ten. (R. at 51.) Plaintiff testified that he could not fully rotate his head in either direction and that the pain makes it difficult for him to fall asleep. (R. at 51, 57.) Heating pads, hot baths, and medication provide only temporary relief, he explained. (R. at 52-53.) Plaintiff believes that his pain would prevent him from walking for more than a few blocks, standing for longer than five minutes at a time, or lifting more than 20 pounds. (R. at 59-60.) When asked whether he has side effects from his pain medications, Plaintiff testified that his memory has gotten much worse. (R. at 53.)

Regarding daily activities, Plaintiff is unable to maintain concentration for long periods of time. (R. at 57-58.) Plaintiff testified that he is able to drive, but goes only to "the store" and the doctor's office. (R. at 58.) Plaintiff further testified that he feels disconnected from others, and that he no longer maintains relationships with his brothers or friends. (R. at 56.) He also does not engage in hobbies he once regularly enjoyed, such as playing horseshoes and fishing. (R.

at 59.) He currently sees a therapist every two to three months and takes Prozac for depression. (*Id.*) On the date of the hearing, he testified that he took 20 milligrams of Prozac, an increase from the amount prescribed in the last medical note in the administrative record. (R. at 64.)

### 3. Testimony of Plaintiff's Wife

Plaintiff's wife, Charmaine Albertsen, also testified about Plaintiff's mental and physical impairments. Ms. Albertsen and Plaintiff have been married for 16 years. (R. at 61.) She testified that Plaintiff is unable to perform many routine daily activities, such as household chores. (*Id.*) She tried to teach him how to do laundry, for example, but he could not grasp how to use the buttons on the washer and dryer. (R. at 61-62.) He has similar difficulties with the television set; she noted: "[H]e can't even find the button on the television. If he can't work the button on the remote, he goes to the television and he can't find the button or the volume on the television. It's just an everyday thing with him." (R. at 62.) Plaintiff also has difficulties remembering conversations, including what occurs on television shows; Ms. Albertsen stated that "five minutes later he'll ask me … exactly what they just showed on the television. Then he gets aggravated and he just refused [sic] to watch TV or have a conversation." (R. at 63.) According to her testimony, Plaintiff tends to avoid most social interaction, has lost interest in many activities that he performed in the past, and is often emotionless and expressionless. (R. at 61-63.)

### 4. Medical Expert Testimony

The ALJ gave significant weight to the testimony of medical expert Dr. Carl Leigh, M.D., who testified that Plaintiff appears to suffer from degenerative disc disease and hypertension. (R. at 65.) Based on his assessment of the record, Dr. Leigh opined that Plaintiff would have been considered disabled from May 1, 2008, six months before the MRI showing that Plaintiff had a herniated disc, until July 31, 2009, three months after Plaintiff's discectomy. (*Id.*) Dr. Leigh believed that, prior to May 1, 2008, Plaintiff would have been able to perform sedentary

occupations in which he could sit and stand at will, so long as he did not crawl or climb ladders, ropes, or scaffolds, and only occasionally kneeled, stooped, crouched, climbed ramps or stairs, reached overhead with his left arm, or hyperextended his neck.  (R. at 66.)  Beginning on August 1, 2009 and continuing to the present, Dr. Leigh testified, Plaintiff could perform this same work, and would no longer have any restrictions on moving his neck.  (*Id.*)  In discussing the medical evidence, Dr. Leigh noted that Plaintiff had a "non-antalgic gait" and "full range of motion at the lumbar spine" when examined by Dr. Taiwo in December 2006.  (*Id.* at 65.)  Dr. Leigh discussed the October 30, 2008 MRI that showed a herniated disc at level C5-C6, the reason for the April 2009 surgery.  (*Id.*)  Dr. Leigh did not discuss Plaintiff's gait or range of motion in 2008.

Dr. Leigh testified that he had not taken into consideration Plaintiff's mental impairments, but that based on the testimony of Plaintiff's wife, Plaintiff's symptoms of decreased concentration and short-term memory loss could be attributed to the combination of Norco and Prozac, which can result in fatigue and drowsiness when taken in large dosages.  (R. at 67.)  He acknowledged, however, that those symptoms "could be due to something else as well," and declined to offer any further opinion on this issue because any such additional opinion would be beyond his expertise.  (*Id.*)

### 5.  Vocational Expert Testimony

The ALJ also heard from vocational expert Grace Gianforte.  She described Plaintiff's prior jobs as a painter and security guard in terms of the level of physical exertion required to perform them and in terms of the Department of Labor's *Dictionary of Occupational Titles*.  (R. at 68.)  The ALJ asked Gianforte to assume that Plaintiff would be limited to sedentary work, with no climbing of ladders, ropes, or scaffolds, or crawling, and only occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, or overhead reaching with his left arm.  (R. at 69.)  The ALJ asked Gianforte to further assume that Plaintiff should avoid unprotected heights and dangerous or moving machinery; would be limited to only occasional

flexion, rotation, and hyperextension of the neck, which would mean avoiding repetitive, prolonged neck motions; would need to alternate between sitting and standing at will; would be limited to performing unskilled, simple, routine, and repetitive tasks; and should have "minimal contact with supervisors, coworkers, and the public." (R. at 70-71.) Gianforte testified that, based on those job restrictions, Plaintiff would be unable to perform any of his past relevant work, but his skills could transfer to positions such as an assembler (3,500 jobs in the Chicago area), an electronics dial marketer (500 jobs in the Chicago area), or optical worker/lens inspector (800 jobs in the Chicago area). (R. at 71.) Gianforte also suggested Plaintiff could work at a coin-operated laundry as an attendant; in such a position, Plaintiff would be able to spend most of the time sitting, but would "have to stand if a customer comes in and needs instructions in how to operate the washer[.]" (R. at 70.) Plaintiff's attorney asked Gianforte to assume that Plaintiff must be "off task" for 20 percent of the workday due to side effects of medications, depression, and fatigue; Gianforte testified that such a restriction would render Plaintiff unable to perform any available job. (R. at 72.)

## DISCUSSION

### A. Legal Framework

The Social Security Act authorizes judicial review of final decisions of the Commissioner of Social Security. *See* 42 U.S.C. § 405(g). In this case, the ALJ's decision became the final decision of the Commissioner when the Appeals Council declined Plaintiff's request for review. *Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014) (citing *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007)). The appropriate standard of review has been described in a variety of ways. This court will not "reweigh the evidence or substitute [its] own judgment for that of the ALJ." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). The court does, however, conduct "a critical review of the evidence, considering both the evidence that supports, as well as the evidence that detracts from, the [ALJ's] decision," *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) (internal quotations omitted), in order to determine whether the ALJ's

decision is supported by substantial evidence. Substantial evidence means evidence that a "reasonable mind might accept as adequate to support a conclusion," *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (internal quotations and citations omitted); it "must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (internal citation omitted). If the decision is supported by substantial evidence and the ALJ has applied the correct legal standards, the decision will be affirmed. *Bates v. Colvin*, 736 F.3d 1093, 1097-98 (7th Cir. 2013). Conversely, the ALJ's decision cannot stand "if it lacks evidentiary support or an adequate discussion of the issues." *Briscoe*, 425 F.3d at 351.

Under the Social Security Act, a person is "disabled" for purposes of disability insurance benefits if he or she is unable to engage in substantial gainful activity due to a medically-determinable physical or mental impairment. 42 U.S.C. § 423(d)(1)(A); *Weatherbee v. Astrue,* 649 F.3d 565, 568 (7th Cir. 2011). In determining whether a claimant is disabled, an ALJ follows a five-step process. *See* 20 C.F.R. § 404.1520(4). This analysis requires the ALJ to examine (1) whether the claimant has engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant is automatically disabled because his severe impairment meets or is equal to an impairment that is considered conclusively disabling under 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether he can perform his past work given his RFC; and (5) if not, whether the claimant can perform any other work in the national economy, given his RFC, age, education, and work experience. *Cerentano v. UMWA Health & Ret. Funds,* 735 F.3d 976, 980 (7th Cir. 2013); *see* 20 C.F.R. § 404.1520.

Where, as in this case, a claimant presents evidence that he or she suffers from a mental impairment, the ALJ must also apply the "special technique" set forth in 20 C.F.R. § 404.1520a, "used to analyze whether a claimant has a medically determinable mental impairment and whether that impairment causes functional limitations." *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008). Under this technique, at steps two and three of the five-step

analysis, the ALJ must evaluate the claimant's "pertinent symptoms, signs, and laboratory findings to determine whether [the claimant has] a medically determinable impairment." 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). Then, if the ALJ determines that the claimant has a medically determinable impairment, the ALJ must "rate the degree" of limitation in "four broad functional areas": activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Id.* §§ 404.1520a(b)(2), 416.920a(c)(4). Courts refer to these functional areas as the "B criteria." *See Craft,* 539 F.3d at 674. The ALJ must rate the claimant's limitation in the first three categories (ranging from none, to mild, moderate, marked, or extreme) and number the claimant's episodes of decompensation. 20 C.F.R. § 404.1520a(c)(4). If there are no episodes of decompensation, and the rating in each of the first three categories is none or mild, the impairment generally is not considered severe and the claimant is not considered disabled by his mental impairment. *Id.* § 404.1520a(d)(1).

If the ALJ finds that the claimant was disabled for a period of time due to a mental or physical impairment, then assessing whether the disability continues or ends calls for a slightly modified eight-step evaluation. *See* 20 C.F.R. § 404.1594(f); *Jones v. Shalala*, 10 F.3d 522 (7th Cir. 1993). Steps one and two of the eight-step analysis are redundant of steps one and three in the five-step analysis summarized above. The ALJ must first determine whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1591(f)(1). If so, the claimant is no longer disabled and the analysis ends. If the claimant is not engaged in substantial gainful activity, the ALJ proceeds to the second step, determining whether the claimant's impairment meets or is equal to an impairment listed under 20 C.F.R. § 404, Subpart P, Appendix 1. *Id.* § 404.1591(f)(2); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir. 2010). If the impairment meets or equals one of the listed impairments in step two, the claimant's disability continues, and the ALJ need not make any further inquiries. *See Craft*, 539 F.3d at 674. If the claimant's impairment does not meet a listed impairment under step two, however, the analysis proceeds to step three, which calls for the ALJ to determine whether, at any point, there has

been any "medical improvement" in the claimant's impairment, as shown by a decrease in medical severity "in the symptoms, signs and/or laboratory findings associated with [the claimant's] impairment(s)." 20 C.F.R. §§ 404.1594(b)(1), 404.1594(f)(3). If a medical improvement has occurred, at step four, the ALJ must determine whether the medical improvement affects the claimant's ability to work. *Id.* § 404.1594(f)(4). If it does, the analysis proceeds to the sixth step. If it does not, at step five, the ALJ determines whether there is any statutory exception that would allow the ALJ to find disability ended without a finding of medical improvement.[8] Step six calls for the ALJ to consider whether all of the claimant's current impairments in combination are severe, meaning they significantly limit the claimant's ability to perform basic work activities. *Id.* § 404.1594(f)(6). If the ALJ determines that the impairments are severe, at step seven the ALJ will assess claimant's RFC based on all current impairments, and whether claimant can still perform his past work. If the claimant cannot do work he has done in the past, the ALJ assesses whether, given the RFC, claimant can do any other work that exists in significant quantity in the national economy. *Id.* § 404.1594(f)(7)-(8).

Finally, the Social Security Administration (the "Administration") recently updated its guidance for evaluating symptoms in disability claims. *See* SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016). *See Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999) (applying new regulations adopted while claimant's request for judicial review was pending). The new ruling eliminates the term "credibility" from the Administration's sub-regulatory policies to "clarify that subjective symptom evaluation is not an examination of the individual's character." SSR 16-3p, 2016 WL 1119029. at *1. Both versions of the ruling describe a two-step process for evaluating a claimant's own description of his or her impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." *See* SSR

_____
[8]      Statutory exceptions, listed at § 404.1594(d)-(e) would include, for example, a determination that substantial evidence demonstrates that any prior disability determination was in error.

16-3p; *see also* C.F.R. § 416.929. Second, "once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, we evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . . ." *Id.*

## B.    The ALJ's Decision

The ALJ concluded that Plaintiff was disabled for a closed period of time, from May 1, 2008 through July 31, 2009, due to the following severe physical impairments: degenerative disc disease of the spine, status post-discectomy, and hypertension. (R. at 28.) The ALJ then determined that a medical improvement had occurred as of August 1, 2009, which ended Plaintiff's disability by rendering him capable of performing certain types of sedentary occupations that exist in the national economy. In determining this closed period, the ALJ relied heavily on the testimony of Dr. Leigh. (R. at 34-37.)

The ALJ's analysis adhered to the five-step process described above in 20 C.F.R. § 404.1520 for determining whether Plaintiff had a disability at any point during the relevant time period. The ALJ first noted that Plaintiff had not engaged in substantial gainful activity since April 23, 2006, the onset date of his alleged disability. (*Id.*) Proceeding to the next steps, the ALJ examined Plaintiff's medical treatment records from 2006 and 2007 and found that, because Plaintiff's physical and psychological symptoms did not significantly limit his ability to perform basic work activities, Plaintiff's impairments prior to May 1, 2008 were not severe. (R. at 51.) In making this determination, the ALJ gave little weight to Dr. Mikuzis's December 2007 opinion that Plaintiff's physical impairments precluded him from ever being able to work. That opinion, in the ALJ's view, was inconsistent with the remainder of Dr. Mikuzis's treatment records as well as the physical examination performed by the state physician, Dr. Taiwo, at the end of 2006. (*Id.*) Instead, the ALJ concluded that, prior to May 1, 2008, Plaintiff had the RFC to perform certain sedentary work. In her RFC finding, the ALJ acknowledged that Plaintiff (1)

14

could not crawl or climb ladders, ropes, or scaffolds; (2) could only occasionally balance, stoop, kneel, crouch, climb ramps and stairs, reach overhead with his left harm, or engage in hyperextension of his neck; (2) needed to have the option to alternate between sitting and standing at will; (3) needed to avoid exposure to unprotected heights and dangerous machinery; and (4) was limited to performing unskilled, simple, repetitive, and routine tasks.  In addition, the ALJ concluded that Plaintiff could only interact with supervisors, co-workers, and the general public on an intermittent basis.  (R. at 30.)

After reviewing the medical evidence and the testimony of the medical expert, Dr. Leigh, the ALJ found that beginning on May 1, 2008, Plaintiff suffered from degenerative disc disease and a herniated disc that resulted in some nerve root compression and limitations in his range of motion.  (*Id.*)  The ALJ then reviewed the postsurgical medical records following Plaintiff's April 2009 discectomy, and applying the eight-step process in 20 C.F.R. § 404.1594(f), determined that a medical improvement occurred as of August 1, 2009, which ended Plaintiff's disability. The ALJ's finding of medical improvement as of that date rested on the opinion testimony of Dr. Leigh and Plaintiff's postsurgical medical records, which, according to the ALJ, demonstrated that Plaintiff's condition "vastly improved to a level where he would not necessarily be precluded from performing all jobs that exist in the national economy."  (R. 55.)  The postsurgical medical evidence did not reveal any new findings of disc herniation or nerve root compression, and showed "no joint pain or restriction of motion, normal gait, and full muscle strength."  (*Id.* at 35, 55.)  The ALJ noted that Plaintiff's treating physician had recommended "fairly conservative methods of pain relief," such as at-home exercise, heat and ice compression, and continued medication, which also suggested to the ALJ that Plaintiff's post-discectomy physical impairments were not severe.  (*Id.*)

The ALJ found that Plaintiff's statements concerning his pain and symptoms were not credible for the period after August 1, 2009.  (R. at 36.)   In reaching this conclusion, the ALJ noted that Plaintiff's medications "were effective in relieving his back and neck pain, with no side

effects," (R. at 35), and that "claimant's post-surgical records routinely noted no joint pain or restriction of motion, normal gait, and full muscle strength." (R. at 37.) Plaintiff's treating physicians only recommended "fairly conservative methods of pain relief since his surgery, including home exercise, heat and ice compression, and continued medication." (R. at 37.) The ALJ conceded that Plaintiff "experience[d] some neck spasms in June of 2009." (R. at 35.) Significantly, however, she made no mention of Plaintiff's treating physicians' notes of continuing neck spasms on July 23, 2009 and August 20, 2009; that Plaintiff rated his pain on July 23, 2009 as a seven on a scale from one to ten; nor the August 20, 2009 treatment notes that Plaintiff had "increased complaints of pain in his neck and he has stiffness." (R. 37; R. at 664; R. at 666.)

With respect to Plaintiff's depression, anxiety, and adjustment disorder, the ALJ applied the "special technique" set forth in 20 C.F.R. § 404.1520a and found that these impairments were not severe. (R. at 30.) In making this determination, the ALJ relied on Dr. Hilger's 2006 examination of Plaintiff, as well as Plaintiff's psychological treatment records from June 2008, January 2009, and June 2009. (R. at 36.) Those records, the ALJ noted, did not include significant accompanying clinical observations. (R. at 36.) The ALJ found that Plaintiff's judgment was fair, and his motor activity was within normal limits. She also noted the July 2009 treatment record stating that Plaintiff had no neurological deficits and denied experiencing dizziness. The fact that Plaintiff was not experiencing dizziness, despite taking his medications, "indicates that any side effects issuing from his medications were likely not especially severe," the ALJ concluded. (R. at 27.) The ALJ made no mention of the documented fatigue, or Plaintiff's "subdued!" affect. She determined that the treatment records did not document the "significant cognitive and social deficits attested to by claimant's wife" (R. at 30), that Plaintiff's psychological symptoms were "mild" and only "minimally interfere[d]" with his ability to perform basic unskilled work activities. (R. at 37, 51.)

The ALJ stated that "Dr. Leigh did not specifically comment on the claimant's psychological symptoms, but he believed that his symptoms of fatigue, drowsiness, decreased concentration, and short term memory problems could be attributed to his medications." (R. at 34.) In fact, Dr. Leigh testified that "[i]f [Plaintiff is] taking the 10-milligram Norco, two of those are 20 milligrams, three to four times a day, that's a large amount." (R. at 67). When asked whether the medications could cause memory issues, Dr. Leigh testified that, "Yes . . . I'm not saying it couldn't be due to something else as well, but that goes beyond my – range of testimony and my expertise." (*Id.*)

In assessing Plaintiff's RFC, the ALJ concluded that, beginning on August 1, 2009, Plaintiff had the RFC to perform sedentary work, though he continued to have several of the limitations he had prior to May 1, 2008: he (1) cannot crawl or climb ladders, ropes, or scaffolds; (2) can only occasionally balance, stoop, kneel, crouch, climb ramps and stairs, or reach overhead with his left arm; (3) needs to have the option to alternate between sitting and standing at will; (4) is limited to performing unskilled, simple, repetitive, and routine tasks; and (5) can interact appropriately with supervisors, co-workers, and the general public only on an "intermittent basis." (R. at 36.) In addition, the ALJ determined that Plaintiff should avoid all exposure to unprotected heights and dangerous machinery. (*Id.*) The ALJ found that Plaintiff's statements concerning the intensity and limiting effects of his physical symptoms were not credible beginning on August 1, 2009, to the extent that they were inconsistent with this RFC assessment. (*Id.*) Finally, the ALJ determined that, although Plaintiff cannot perform his past relevant work as a painter or security guard, Plaintiff can perform other occupations identified by the vocational expert, such as assembler, electronics dial marketer, and optical worker/lens inspector—jobs which exist in significant numbers in the regional and national economy. (R. at 39.)

In his summary judgment motion, Plaintiff challenges the ALJ's decision on five grounds. Specifically, Plaintiff contends, the ALJ erred in (1) finding that medical improvement occurred

as of August 1, 2009, rendering Plaintiff non-disabled from August 1, 2009 to the date of the ALJ's decision; (2) finding that Plaintiff's mental impairments, including his depression and anxiety, were not severe; and (3) characterizing the side effects of Plaintiff's medication as minimal. The ALJ also erred, Plaintiff contends, in (4) failing to provide sufficient reasons for rejecting the December 2007 opinion of Plaintiff's treating physician, Dr. Mikuzis, and (5) asking the vocational expert to identify jobs involving "minimal" contact with other individuals. The suggestion that Plaintiff could perform jobs involving "minimal" contact with others was inconsistent, Plaintiff contends, with the RFC finding that Plaintiff is capable of interacting with other individuals only on an "intermittent" basis. (Pl. Mem. [10] at 10-15.) The court addresses each of Plaintiff's contentions in turn.

## B.    Analysis of the ALJ's Findings

### 1.    The ALJ's Finding That Medical Improvement Occurred as of August 1, 2009

As explained above, the ALJ concluded that Plaintiff was disabled for a closed period of time beginning on May 1, 2008; that he experienced medical improvement as of August 1, 2009; and that he was thereafter capable of performing certain sedentary, routine, non-skilled work. To support her findings, the ALJ was not required to mention every piece of evidence, but she was expected to provide an "accurate and logical bridge . . . to confront the evidence in [Plaintiff's] favor and explain why it was rejected before concluding that [his] impairments did not impose more than a minimal limitation on her ability to perform basic work tasks." *Thomas v. Colvin*, 534 Fed. Appx. 546, 550 (7th Cir. 2014) (citing *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)); *see also Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (If the decision "lacks adequate discussion of the issues, it will be remanded.") The court is not satisfied, on this record, that the ALJ's decision has met that test.

The ALJ did not confront favorable evidence to Plaintiff that indicated medical improvement had *not* occurred. Specifically, the ALJ did not explain the inconsistency between

her conclusion and the most recent medical records. See 20 C.F.R. § 404.1594(b) (1); 20 C.F.R. § 416.994(b)(1)(l) (to find medical improvement, an ALJ must compare the medical reports that reflect an allegedly improved claimant and the claimant's most recent medical reports at the time of his disability). First, Plaintiff's pain and spasms persisted post-surgery; the ALJ mentions spasms in the June 2009 note but does not discuss that the spasms persisted according to the August 20, 2009 report. On August 20, 2009, in addition to spasms, Dr. Jackson noted that Plaintiff experienced "*increased* neck pain." (Pl. Mem. at 10.) (emphasis added). While seemingly ignoring the most recent medical report, the ALJ relies on the July 23, 2009 Dr. Harvey note as an indication of Plaintiff's improvement. But that note is internally inconsistent. Dr. Harvey states that Plaintiff is "not having any pain symptoms following the surgery" but then reports that Plaintiff's pain at seven on a one-to-ten scale, and that Plaintiff is experiencing focal pain to his mid-back between his shoulder blades. The ALJ's decision does not offer an explanation for rejecting the most recent medical reports while relying on Dr. Harvey's inconsistent treatment note.

The ALJ also erred in rejecting Plaintiff's own descriptions of his pain as not credible after August 1, 2009. Both SSR 16-3p and its predecessor SSR 96-7p require the ALJ to consider "the entire case record, including the objective medical evidence," and "the individual's own statements about symptoms[.]" *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007). In assessing Plaintiff's subjective complaints of pain, the ALJ must determine, first, whether there is an underlying physical or mental impairment expected to produce Plaintiff's symptoms, and, second, whether the intensity and persistence of those symptoms limit an individual's ability to perform work-related activities. *See* SSR 96-7p; SSR 16-3p. The ALJ was unmoved by Plaintiff's statements about the persistence and intensity of the pain he experienced after August 1, 2009. She observed, "Despite the allegations from claimant and his wife that he still experiences severely limiting pain, the claimant's post-surgical records routinely noted no joint pain or restriction of motion, normal gait, and full muscle strength." (R. at 37.) Yet Plaintiff's

hearing testimony—that his pain had returned to pre-surgical levels, and that there had been no improvement in his daily activities—was in fact consistent with his report to Dr. Jackson on August 20, 2009. On that date, he told Dr. Jackson that his pain was a seven out of ten, an increase from February 25, 2009, when treatment notes record his pain level at just five. Notably, the ALJ concluded that Plaintiff was disabled as of February 2009. (R. at 640.) She has not explained her decision to discredit worsening complaints of pain after the closed period of disability.

### 2.      The ALJ's Finding That Plaintiff's Mental Impairments Were Not Severe

The ALJ concluded that Plaintiff's mental impairments of depression, anxiety, and adjustment disorder were not severe and did not preclude Plaintiff from successfully performing certain sedentary, routine, unskilled jobs. Plaintiff takes issue with this conclusion, as well; he contends that the ALJ failed to consider relevant, recent evidence on this issue and instead only included "stale" evidence. (Pl. Mem. at 12.) Again, the court agrees. In addressing this issue, the ALJ evaluated the evidence of Plaintiff's mental impairment from 2007, but made no reference to evidence concerning his mental impairments at later time periods. Again, the court is unable to discern the logical bridge to the ALJ's conclusion that his mental impairment, as of 2009, was not severe.

The ALJ did not specifically mention 20 C.F.R. § 404.1520a, but it appears that she understood the need to engage in the steps required by that regulation for evaluating a claimant's mental disability. (R. at 30.) The ALJ first determined that Plaintiff suffered from depression and adjustment disorder. (R. at 30.); *see* 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). The ALJ also recognized that Plaintiff received treatment and was taking medication for depression, but she determined that he had only mild limitations in each of the "paragraph B criteria:" "daily living, social functioning, and concentration, persistence, or pace." (*Id.*); *see* 20 C.F.R §§ 404.1520a(b)(2), 416.920a(c)(4). The ALJ further found that Plaintiff had not experienced any episodes of decompensation. (*Id.*); *see* 20 C.F.R. Pt. 404, subpt. P, app. 1

§§ 12.00C.4, 12.04, 12.06, 12.09 (a severe mental impairment requires three episodes of decompensation within one year, or an average of once every four months, each lasting for at least two weeks).  Plaintiff's symptoms, according to the ALJ, "are quite mild and only minimally interfere with his ability to perform basic work activities."  (R. at 37.)

Though she adhered to the framework established by 20 C.F.R. § 404.1520a, the court is unable to discern the bases for her findings, or how she established the time frame during which she found Plaintiff disabled.  In determining that Plaintiff did not have a mental impairment after July 2009, the ALJ gave "very great weight" to the January 2007 findings of William Higler, Ph.D.  (R. at 30.)  In 2007, when Plaintiff saw Dr. Higler, he was diagnosed with "mild depression" stemming from his loss of unemployment. Dr. Higler noted that Plaintiff never received psychiatric treatment, nor was he taking psychotropic medications.  (R. at 32, 469.)  By 2009, however, there is evidence that Plaintiff was diagnosed with major depressive disorder, had complained of memory issues, and took prescribed psychotropic medications.  In a January 2009 psychiatric evaluation, Plaintiff's diagnosis changed from mild depression to "major depressive disorder," and Plaintiff reported having poor concentration and decision-making, worsening memory, and suicidal thoughts.  (Pl. Mem. at 11.)  Plaintiff also points out that the ALJ ignored evidence that Plaintiff's February 2009 psychiatric evaluation noted Plaintiff had slowed motor activity and a circumstantial thought process, and required an increase in his dosage of Prozac.  (*Id.* at 12.)  The ALJ also relies on a 2007 treatment note stating Plaintiff does not take psychotropic medication.  She did not address the steady increase in Plaintiff's dosage of Lexapro and then Prozac leading up to the date of the hearing (*Id.* at 12), nor did the ALJ provide an adequate explanation for relying on 2007 evidence to support a conclusion about the severity of Plaintiff's mental impairment at the time of the hearing.

The ALJ discredited Plaintiff's testimony, and that of his wife, regarding the severity of his mental impairment.  As described above, the regulations call for a two-step process for evaluating a claimant's own description of his impairments, determining, first, whether there is

an underlying impairment, and second, whether the intensity and persistence of the claimant's symptoms limit his or her ability to perform work-related activities. *See* SSR 96-7p; SSR 16-3p. The determination must be "consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* The ALJ determined that the psychological treatment records do not support the "significant cognitive and social deficits attested to by claimant's wife." (R. at 37.) The court finds this determination inconsistent with the evidence.

At the hearing, Plaintiff testified that he no longer engages in hobbies he once enjoyed; does not have relationships with people in his life; and suffered from worsening memory. (R. at 56.) His wife confirmed these symptoms. (R. at 61-64.) Notably, in remanding this case to the ALJ, the Appeals Council noted the ALJ's failure to discuss any of the wife's specific testimony. The ALJ's subsequent decision does not correct this defect. (R. at 137-138.) Plaintiff's wife testified that she had tried to demonstrate simple tasks around the house, but her husband was unable to carry them out because of his memory problems. He is unable to remember how to operate the washing machine; and she regularly has to remind him how to change the volume on the television set. While the ALJ mentions some of this evidence, she never explains her basis for ultimately finding the testimony not credible, and reaching the inconsistent conclusion that Plaintiff could perform simple, routine tasks. (R. at 30.)

On remand, in determining the severity of Plaintiff's mental impairments, the ALJ should take care to reevaluate Plaintiff's subjective complaints and his wife's testimony in accordance with SSR 16-p3.

### 3. The ALJ's Finding That Plaintiff's Medication Side-Effects Were Minimal

Next, Plaintiff argues that the ALJ erred in finding that the side effects of Plaintiff's medications were minimal because the ALJ failed to consider the testimony of the medical expert, Dr. Leigh, that Plaintiff's medications, namely the combination of Prozac and Norco, could lead to fatigue, drowsiness, lack of concentration, and problems with short-term memory.

(Pl. Mem. at 12-13.)  While the ALJ mentions this testimony, the court agrees that she did not adequately explain why it did not alter her ultimate conclusions regarding Plaintiff's RFC.

"The side effects of medication can significantly affect an individual's ability to work and therefore should figure in the disability determination process." *Flores v. Massanari*, 19 F. App'x 393, 400 (7th Cir. 2001) (citing *Porch v. Chater*, 115 F.3d 567 (8th Cir.1997).  In *Flores*, claimant suffered from oral lesions he controlled through a high dose of steroids which, he claimed, resulted in debilitating side effects, including fatigue.  *Id.*  The ALJ asked just one question about that issue at the hearing, and did not meaningfully consider the side effects.  The ALJ's failure to consider a relevant line of evidence required remand.  *Id.*  400.  In *Brown v. Barnhart*, 298 F.Supp.2d 773 (E.D. WI 2004), similarly, when the claimant, like Plaintiff here, suffered from side effects of medications she took for dislocated discs in her back, the court noted that "[c]ourts have condemned ALJs for failing to consider such evidence when it was potentially relevant to the claimant's ability to work," and remanded the case for further consideration.  *Id.* (citing *Beckley v. Apfel*, 152 F.3d 1056, 1060 (8th Cir. 1998).

Here, too, the ALJ engaged in a cursory discussion of medical side effects.  She pointed out that Plaintiff had denied dizziness in July 2009, as reflected in a treatment note.  But dizziness (or its absence) is not dispositive in determining residual capacity, and the ALJ must consider the entire record, including Plaintiff's complaints of fatigue, drowsiness, lack of concentration, and problems with memory—all documented in the medical records and in his testimony.  And, while the ALJ gave controlling weight to Dr. Leigh's testimony concerning Plaintiff's physical condition, she discounted the observations he made about the side effects of the medication he is taking: "Dr. Leigh did not specifically comment on the claimant's psychological symptoms, but he believed that his symptoms of fatigue, drowsiness, decreased concentration, and short term memory problems could be attributed to his medications."  (R. at 34.)  The ALJ then concluded that she had "accounted for mental limitations that the claimant may have as a result of his non-severe depression or the side effects of his various medication

[in assessing RFC]," but does not explain how she had accounted for these factors. (*Id.*) *See Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002) ("Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed.") (internal citations omitted.)

### 4. The Opinion of Plaintiff's Treating Physician

Plaintiff next contends that the ALJ failed to provide sufficient reasons for discounting the December 2007 opinion of Plaintiff's treating physician, Dr. Mikuzis. (Pl. Mem. at 13-14.) The ALJ gave "very little weight" to the opinion. (R. at 33.) Defending this decision, the Secretary contends that the ALJ properly found Dr. Mikuzis's "extreme opinion of total disability" inconsistent with his medical records, and that the ALJ therefore properly relied instead on one 2006 exam and Dr. Leigh's testimony regarding medical improvement. (Def. Mem. at 11.)

To the extent that Dr. Mizukis's testimony suggests that Plaintiff remained disabled indefinitely even after reaching medical improvement in August 2009, the ALJ is on solid ground in giving that testimony little weight. More troubling is her determination to discount his testimony concerning the period prior to May 1, 2008, when Dr. Mizukis was regularly treating him. Social Security regulations direct an ALJ to evaluate each medical opinion in the record. 20 C.F.R. § 404.1527(c). The opinion of a claimant's treating physician is entitled to controlling weight as long as it is supported by medical findings and is not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2); *Loveless v. Colvin*, 810 F.3d 502, 507 (7th Cir. 2016); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). When an ALJ decides not to give controlling weight to a claimant's treating physician, the ALJ must provide a sound explanation for doing so. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). In general, the opinions of physicians who have examined the patient merit more weight than the opinions of physicians who have only reviewed a claimant's medical records or files. *See Gitdgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

In this case, the ALJ offered no compelling explanation for rejecting Dr. Mikuzis's opinion regarding Plaintiff's disability prior to May 2008. In her decision, the ALJ noted that throughout 2006 and 2007, Dr. Mikuzis had routinely indicated that Plaintiff was retaining full ranges of motion in his joints, as well as normal muscle strength and gait. (R. at 33.) The Secretary contends that Dr. Mikuzis's opinion of total disability is inconsistent with these treatment records. Yet, as Plaintiff points out, the ALJ herself recognized that Dr. Mikuzis did not consistently note normal muscle strength; in his December 29, 2007 report, Dr. Mikuzis stated that in his last examination of Plaintiff, on December 21, 2007, Plaintiff had "restricted forward flexion and poor rotation of his neck with perhaps 50% of normal rotation, and side bending of his neck." (*Id.* at 600.) In any event, muscle strength, normal gait, and absence of joint pain are not dispositive; Plaintiff had these characteristics even during the period of time when the ALJ determined he was disabled. In a January 7, 2009 treatment note, for example, there was no joint pain and normal gait, yet Plaintiff reported his pain as a nine out of ten, and had visited the ER due to his pain. (R. at 612.) It is unclear, therefore, why the absence of joint pain or gait abnormality requires the conclusion that Plaintiff was not disabled prior to 2008. The ALJ also does not acknowledge the increase in pain medication over the time Dr. Mikuzis saw Plaintiff; by the date of his last treatment, Plaintiff required 8-10 Norco per day – approximately 3 to 4 times what he was using in 2003 (R. at 600), an amount of pain medication that Dr. Leigh called "very large." (R. at 67.) The ALJ also refers to Dr. Taiwo's treatment note from 2006 (R. at 32), but does not explain why a single examination in 2006 supports the conclusion that Plaintiff was not disabled for the entire period prior to May 2008. And the ALJ's emphasis on Dr. Leigh's testimony is also unsatisfying; Dr. Leigh did not specifically address the period prior to May 2008. In short, the court remains uncertain how the ALJ concluded that Plaintiff's disability did not begin until May 2008.

The cases the Secretary cites to do not alter this court's analysis. In *Schmidt v. Astrue*, 496 F.3d 833 (7th Cir. 2007), the ALJ determined the treating physician's conclusion that

claimant was incapable of performing even sedentary work was not supported by medical evidence in the record when the examinations were deemed "benign" and the claimant only complained of numbness and tingling. Notably, the Seventh Circuit has observed that a treating physician's opinion may be suspect where it appears that the treating physician is doing a favor for the patient by making a disability finding. *Schmidt* illustrates the concern: in that case, the claimant's attorney actually drafted the "Functional Capacity Questionnaire," and claimant's physician simply signed answers to the relevant questions without elaborating on any of his opinions. *Id.* at 843. Here, Dr. Mikuzis elaborated on his opinions, and his treatment records do not suggest that Plaintiff's condition was benign; to the contrary, the ALJ herself noted a "dramatic increase[]" in the pain medication Plaintiff used after 2003, symptoms of depression, and consistent soreness and stiffness throughout 2006 and 2007. (R. at 33.)

*Luster v. Astrue*, 358 Fed. Appx. 738 (7th Cir. 2010), is also distinguishable. There, the ALJ gave "good reasons for discounting" the treating physician's conclusions, for example, the treating physician's "puzzling[]" reference to a history of cerebral stroke even after confirming that a CT scan showed no stroke had occurred. *Id.* at 741. And in *Murphy v. Astrue*, 454 Fed. Appx. 514 (7th Cir. 2012), the ALJ accepted most of the treating physician's conclusions. The exception was the physician's imposition of a two-hour limit on the claimant's standing upright, a limitation that the ALJ found inconsistent with the objective medical evidence, including multiple state agency reports of "normal x-rays," and normal "CT scans." *Id.* at 519. Neither the quality nor the quantity of the objective medical evidence in this case is akin to what was before the ALJ in *Murphy,* nor has the ALJ identified other reasons for discrediting Plaintiff's treating physician's opinion.

### 5. Occupations Identified by the Vocational Expert

Plaintiff's final argument is that the ALJ's hypothetical example to the vocational expert, Gianforte, limiting Plaintiff to "*minimal contact* with supervisors, co-workers, and the public" was inconsistent with the ALJ's RFC finding that Plaintiff could "only interact appropriately with

supervisors, co-workers, and the general public on an *intermittent basis*." (Pl. Mem. at 14.) The court remands for a more thorough explanation, and notes that the ALJ should explain her findings, but not because of this purported inconsistency, which appears to be (as the Secretary contends) a matter of semantics. (Pl. Mem. at 13-14.) Instead, the ALJ's determination is problematic because she discredited the severity of Plaintiff's mental impairments, including side effects of medications, which are relevant to determining what jobs Plaintiff is capable of performing. The court's concern on this score is linked to its need for a more thorough explanation of the ALJ's basis for discrediting Plaintiff and his wife's testimony. In particular, the very activity Plaintiff's wife testified he could not perform—operating the washer and dryer—is the activity that the Vocational Expert deemed a fit for Plaintiff; the VE suggested he could work as an attendant for a coin-operated laundromat, providing instruction to customers on how to operate the machinery. If the ALJ had not discredited evidence of Plaintiff's mental impairment, it seems likely that she would have reached a different conclusion. When Plaintiff's attorney posed the hypothetical that Plaintiff must be "off task" for 20 percent of the workday due to side effects of medications, depression, and fatigue, Gianforte testified that no jobs would be available. (R. at 72.) When the ALJ reconsiders Plaintiff's mental impairments and side effects of medications, the occupations identified by Gianforte should also be reconsidered in light of that evidence.

## CONCLUSION

In summary, substantial evidence does not exist to support the conclusion that Plaintiff was disabled only for the closed period of time established by the ALJ. The decision of the ALJ is reversed, and the case is remanded for further proceedings consistent with this opinion.

ENTER:

Dated: August 17, 2016

_____
REBECCA R. PALLMEYER
United States District Judge